Case No. 14-5316. True the Vote, Inc. Appellant v. Internal Revenue Service of L. Mr. Eastman for the Appellant, Ms. Hagley for the Appellee IRS, and Ms. Nitz for Individual Defendant Appellee. Judge, your time is up. When you said it, well, it's probably time for the next person. Mr. Eastman. Good morning, Judge Geisman. May it please the Court. I want to step back from the last argument just a bit and kind of remind us where we are. The government has admitted that the delays that we're dealing with here were part of a program that targeted groups. I like the phrase, rounded them up and branded them, that prior counsel used. Because of their political views, because of their group names, because of their opposition to government policies. It has admitted that its voluminous requests for information were unnecessary, or to quote one of the defendants, Lois Lerner, wrong, absolutely incorrect, insensitive, and inappropriate. It has acknowledged that the illegal conduct has exposed sensitive information about True the Vote and its founders and supporters, information otherwise protected by law, to public disclosure. All of this is part of a scheme that is quite arguably the biggest domestic scandal of government abuse since Richard Nixon attempted to use the IRS for partisan purposes. And yet the government contends now, and the District Court below accepted, that the mere expedient of granting True the Vote's tax exempt status 1,408 days after the application was filed shields all of that illegal conduct from review and accountability. Prevents anyone, the IRS itself, the individuals who concocted this scheme and perpetrated it from any accountability whatsoever. I don't think mootness gets us there, and we can go through each of those steps. So on mootness, it's not moot for a couple of reasons. One, we've been branded because of our name, because of our political viewpoints, and that branding is ongoing. What's the court's point about that? Well, Your Honor, it forgives a bit of this claim, and we hold people accountable. Yeah, forget about the minimums first. The second thing is, a declaratory judgment that what they did violated the Constitution and an injunction to prevent further violations of it. They continue to persist in the view that, well, yeah, it was kind of unnecessary, but it really wasn't that unconstitutional. I think a declaratory judgment from this court that it was unconstitutional. And to remove what's happening... Well, the declaratory judgment is a very narrow and rare sort of thing. It is. Normally, you're going to have to have something else to tie it to to keep yourself from being a non-justiciable country. Well, the GAO report, which was referenced in the last argument, specifically says that anybody that was targeted and put on those lists before is continuing to be subject to heightened scrutiny in the ongoing enforcement. So an injunction to get you off of that list... That's an injunction. An injunction... And we come back to the question of whether it has actually had a cessation, and if so, is it capable of repetition, yet again? Right, right. But I don't think you even have to get there, because we've got ongoing harm that hasn't been addressed at all. The collection of our documents that they admit were unnecessary are now part of our publicly available file. What are we supposed to do about that? Well, they could expunge the documents that they collected and return them to us or destroy them so that the government doesn't have them and that they're not publicly available. And that would be an easy matter. So that takes it out of movement. It's just on that alone. But then an injunction to say, get these groups that you targeted initially, that you identified for heightened scrutiny at the application stage, and that because of the additional media focus, you now have a special multilayer committee devoted to giving them special review. Get them off of that list. Put them back in the random generator for who gets audited and who gets further inspection. An injunction to that effect would be narrow, and that would be tremendously helpful. And that goes to the ongoing harm, not just the voluntary cessation piece. The voluntary cessation, I don't think they get close to meeting the standard that it's been irrevocable. Your Honor, Judge Santel, you pointed out in the last argument what part of suspending BOLO until further notice meets the irrevocable and irretrievable we're not doing this anymore. We're not doing it until the public attention's moved on, and then we'll start it again. And the whole notion that their guidance, that Congress has stepped in, they were trying to codify some of the very unconstitutional things they were doing here, which is why Congress sought to stop that guidance from going forward. And this is all public knowledge. If we want to take judicial notice of something, it would be that kind of thing, it seems to me. If I may, let me turn to the Bivens claim briefly. Because the litany of circuits that the government claims have rejected Bivens claims against the IRS all have one thing in common. They are all for violations of the Internal Revenue Code, which is what the statutory remedy is designed to achieve. I think, yes, it's part of the legislative history, but it's a statement from the IRS Commissioner himself, a statement, by the way, that the current IRS Commissioner has repeated in our case in their motion to dismiss our APA claim. One of the things for APA, I think wrongly they've alleged, is that if we had any other remedy, and they said we do have another remedy, it's in Bivens, and that we've actually alleged that remedy. The IRS Commissioner in this case, in the pleadings below, said that. And so that confirms what the IRS Commissioner testified in Congress, that the statutory scheme supplements Bivens, those Bivens remedies are available for the kind of egregious conduct we've seen here. And all of the cases, including Kim, dealt with violations of the Internal Revenue Code that were tried to be piggybacked onto a due process claim. The two cases that got closest to this were the Second Circuit case in Hudson Valley and the Fourth Circuit case in Judicial Watch that dealt with First Amendment challenges for retaliatory audits. But that, too, was in conjunction with an audit for which there is a specific damages remedy under the Internal Revenue Code, not the kind of First Amendment violations we've alleged here. And, you know, we want to get kind of that fine distinction between those kind of cases on the one side and this case on the other. The Tenth Circuit offers a very good parallel. It's got a case, the Don case, that deals with the kind of due process issues that Kim dealt with. But it also has two cases, Gibbs and Archer, which this court cited in Kim that were First Amendment claims, and it specifically allowed the First Amendment claims to go forward under Bivens. And I think that's the distinction that the Supreme Court has asked this court to make in assessing whether to allow for a Bivens remedy. And I think the things that went on in Congress demonstrating they adopted this scheme dealing with only violations of the Internal Revenue Code because they knew the other kind of violations would be available to be remedied and addressed under Bivens. Let me then turn to our 6103 claim. Because I think there's been some confusion in the district court below. This was not a claim brought because of the illegal collection of the information. We think that violates our First Amendment rights, and that's part of the relief we saw under our Account 2. But once they illegally collected that information, they had no business to have. And then by their own admission, they inspected it before they reviewed it as part of our application file. They're not inspecting that information, quote, for tax administration purposes as the statute requires. Why isn't that just double-counting the collection? I mean, it's inherent in the collection that they're going to collect it to see it. Well, that means any information they want that they are not legally entitled to, if they just ask for an incident to an application for a nonprofit status, they're going to get to review. That means the entire purpose of 6103 is defeated. And worse, now that they've given us our tax intent, I fail to see how they could collect it. They shouldn't have collected it in the first place. If they've collected it improperly, how they could at that point fail to inspect it. They wouldn't even know it was improper if they hadn't inspected it. Well, see, I mean, our allegation is that they knew it was improper, and therefore they collected it and inspected it not for a tax administration purpose. So it would be inspection only of information that was knowingly unlawfully collected. Or grossly negligent. You know, the standard in the Internal Revenue Code under 6103, if it's grossly negligent, it subjects them to punitive damages. If it's merely negligent, it's still an unlawful inspection. And we have at least that here. And now that because this is part of our nonprofit application file, which, as I said earlier, could be remedied by an injunction to expunge that unlawfully collected information, it's now available for public disclosure as well. So you've got both just the inspection and the disclosure. Now, we've not alleged disclosure in our complaint because it wouldn't have been ripe at the time. That claim didn't become ripe until they granted our application status. But shortly after they granted our application status, we moved to prevent the disclosure of that information. So, you know, again, I'll close with this. We've been branded. The brand affects the ongoing heightened level of scrutiny that applies to our organization as well as all of the other organizations in the prior case. And the notion that we're to trust the IRS's own self-serving reports, and we've solved all of the problems. When TIGDA itself, when GAO, when the House Oversight Committees have all recognized they haven't, by a group of people that have lied to Congress, that have destroyed evidence, that the Department of Justice itself has been excoriated for mischaracterizing what's going on here, you can't trust that this thing has ended. And I think it's extremely important that we get back and actually have a full round of discovery and adversarial process to get to the bottom of this egregious scandal. Mr. Eastman, before I lose you, at 6103A, the provision, well, returns and return information shall be confidential and accept as authorized by this title. No officer or employee shall disclose. There's nothing there about inspect. Well, the next section involves inspect. Right. So then the next one is, shall without written request be open to officer, by or disclosure to officers and employees whose official duties require such inspection or disclosure. What do we make of the fact that disclosure, disclose only is covered in A, and it's down in H1 where there's this disclose or inspect problem? Beyond the fact that the disclose was added later and they didn't clean up all of the statutory provisions? So you're saying it's just sloppy? No, I'm not prepared to say that. Yeah, but I need to focus on a specific language. I think the point here is the inspection and the disclosure both. The inspection can only occur, quote, for tax administration purposes. And our contention here, and this is the heart of the dispute between us, they claim that we voluntarily gave this information to be considered as part of our application. That's patently false. They say in their cover letter for these additional demands of information, if you don't give it to us, it's not that we deny your application, that would give you the ability to bring a court action to challenge our decision. We dismiss your application and we start treating you as a taxable entity. We had no ability to object and still proceed with our application. And because that wrongfully collected information is now in the application file, inspecting it is not for tax administration purposes, but it's part of the continuing scheme to harass us because of our political views. And I don't think that's authorized under 6103, under the subparagraph that includes inspection as well as disclosure. Got it. Thank you. Thank you. Sorry, go ahead. I want to please the court again. The procedures are, with regard to the misdetermination, the procedures are no longer impacting True the Vote because the simple reason, the application has been granted. They have alleged a functional denial in their complaint, and the complaint was solely focused on the application process, and now there's been an actual grant, so they no longer have a personal stake in the outcome of this lawsuit. They have cited nothing that contradicts the Path Forward report, the monthly updates, or the 2015 TIGDA report, confirming that the procedures have been changed and reforms have been put into place. The GAO report that they cite doesn't refute the court's misdetermination, first for the simple reason that it expressly did not address the application process, which is what this suit was about, only exam selection. And it doesn't demonstrate, if you read the report, any existing viewpoint discrimination. There's no finding in the GAO report of any targeting. What GAO found is that some of the internal controls that the IRS had helped the IRS apply the law fairly, but other controls were deficient. There's a summary at page 33 of the GAO report of certain steps the IRS should take to reform those controls, which could increase, quote, the risk that the IRS could select an organization for exam in an unfair manner, based on religious or educational or political or other views. And so this is a potential risk that's too generalized or speculative to provide a live controversy in this case, aside from the fact that the complaint was not addressed to that. The Senate Finance Committee report, the one that was issued last fall, the bipartisan portion of the report on page 5 indicates that the problems at the IRS were confined to the 2010-2013 period. The separate majority report on page 231, I'm giving you the page numbers because it's such a lengthy report, provides that the path forward report and monthly updates indicated that all of TIGDA's recommendations had been implemented by January of 2014 and that TIGDA confirmed that those reforms had been implemented. The report goes on to say that certain structural reforms should take place at the IRS, and this includes removing the IRS from Treasury. It includes eliminating bargaining rights for IRS employees, but those are legislative proposals that the district court would not be able to implement. The district court would only be able to analyze the procedures that were in place in 2010-2013, and since they're no longer in place, it would only be hypothetical exercise for the court. I would like to just say one thing. So if there are deficient procedures in place when the case was filed, and those procedures have since been altered, and then the GAO comes along as recently as July of 2015 and says that there are still ongoing problems with, it's a public document, the court notices it, there are still ongoing problems with the, not the application process, but with this process of selection for review, I think that's what it's put. You're saying, well, that's just too speculative? Well, except for the GAO did not, well, it's outside the complaint, but even if it had been within the complaint about the examination process, GAO did not identify any problems or instances, but just did an audit on controls and found that some controls were good and were helping the IRS examine returns fairly, but others could use some improvement. And GAO made a couple of recommendations and noted that the IRS has agreed to those recommendations. And the IRS is subject to oversight, so the GAO will ensure that those recommendations get put into place. It's such things as updating the IRM or documenting procedures better, and it didn't find any specific risk with regard to political viewpoint, but just said religious or educational, something could happen in the future that didn't identify any specific problems going on. Okay. I mean, it doesn't say you're going to select this particular taxpayer or applicant for tax exempt status. Here's a typical selection. The control deficiencies GAO found increased the risk that EO could select organizations for examination in an unfair manner, for example, based on an organization's religious, educational, political, or other views. It doesn't seem like there's a complete evisceration of the problems that gave rise to the complaint. But it also doesn't demonstrate an actual threatened harm that would satisfy the test for a future harm that could provide that a case is no longer moot. The processes that were complained about in the complaint. This is a little bit tougher standard, and it's the defendant's burden, right, in a voluntary cessation case to show that there's been a complete eradication of the problem so that it cannot recur. But there has been a complete eradication of the problems that were complained about, which related to the application process, the problems of inappropriate criteria being used. TIGTA, GAO did not talk about inappropriate criteria being used in the application process or even in the examination process, didn't talk about substantial delays, didn't talk about the overbroad information request, which is what TIGTA had identified and what the complaint had complained about and alleged that was based on viewpoint discrimination. Those have been changed. What Judge Ginsburg just read to you seemed to speak to selection criteria, which is part of what really is the beginning of what plaintiffs are complaining about, isn't it? I'm sorry? What Judge Ginsburg just read to you seemed to say that there was still a problem with the selection process. That's the beginning of what the complainant is complaining about is the selection process. A potential problem that also found that other procedures at the IRS ensured that that did not happen, that the employees were aware that they needed to focus on the activities of organizations and whether they complied with the law. And what do you understand to be the thrust of what Judge Ginsburg just read to you insofar as it concerns selection process? The GEO identified steps that the IRS should take, and the IRS has agreed to take them. And based on the public record, there's no reason to think that the IRS is not taking those procedures. At the time of that report, they apparently had not taken such steps, right? At the time of what? At the time of what Judge Ginsburg just read to you. That's correct. At the time of the report. Okay, thank you. I think I got the point you were making, which was that this report from which I read dealt with post-application procedures for approved organizations being selected for audit. For any reason, right. Whereas the complaint in this case, as opposed to the prior case, is that what you would say? The complaint in this case focused on the application process. As opposed to the complaint in the prior case. I'm sorry, the complaint in the prior case. The complaint in the prior case is about ongoing effects, right? You're saying that's not part of this case? This is just about applications? This is about, exactly, it's just about the applications. I would like to just say one thing quickly, just on the Bivens, even though we don't represent the Bivens defendants, based on some of the statements that opposing counsel said, I just want to make clear that it is the government's position that the Bivens counsel have accurately described the law in the district court's decision with regard to Bivens was correct. Let me go back to just a moment, focusing on the application. Sure. I'm looking at J53 and complaint on paragraphs 151 to 53. The IRS targeting scheme, et cetera, infringes upon the freedom of speech and association rights of True the Vote and the persons who operate, support, and associate with it in violation of the First Amendment. The application, this is 153, the application of the targeting scheme to True the Vote, has impaired the expressive associational effectiveness of True the Vote and its members. That's an allegation of a continuing nature, as I understand it. And in 154, has had a chilling effect on the willingness and ability of potential donors. That's not mooted by changes in the procedures, right? I think that it is mooted by the change in procedures because the TIGTA found, and the IRS concurs, that the use of the inappropriate criteria on the bill list was inappropriate. It made it appear that the IRS was not being impartial, and the IRS has changed that and made clear, as I read before, the Internal Revenue Manual, that names should not be the criteria, that the activities of the entity should be the criteria for determining tax-exempt review. Right, but meanwhile, or in the past, at the outset, the plaintiffs here were caught up in this scandal, if you will, and there was a great deal of publicity about it. They've said that that inhibited donations and continues to inhibit donations. Why wouldn't a declaration to the effect that their rights were violated, and perhaps an injunction, as Mr. Eastman suggested, with regard to expungement or return of information, why wouldn't that be effective relief for an ongoing harm? Because, well, two things. Number one, with regard to whether the court can make a declaration, would be making a declaration about a procedure that is no longer in place. And now that their application has been granted, they don't have the harms of donors not being willing to give them donations. With regard to the information that they provided to the IRS during the application process, that was also not part of the complaint. But in addition, they knew when they gave the information to the IRS that any papers that were submitted, and this is on 115 of the Joint Appendix and 126, would be available for public inspection. And they were told not to include any information that would have adverse consequences if publicly disclosed. And at that time, they didn't indicate to the IRS that any information would have an adverse consequence. They didn't have to give the information to the IRS. If they thought it was inappropriate, they could have said so. If the IRS had insisted on the information being provided, they could have litigated that issue with the IRS in a 7428 proceeding, as we gave an example in our brief, and they have not addressed the exploratory research case. So if they didn't want to provide the information or they didn't want it publicly disclosed, their choice was to not provide it, have that impairment to whatever degree of their chances of being approved. Was there an opportunity to provide it under some protective provisions? Well, if it was information, 6104 provides that any information provided to support the application must be disclosed, except for it has a few sort of carve-outs, like if it had been a trade secret or a password. It was something proprietary like that. They don't allege that anything that they provided to the IRS would fit into one of those categories. If they had, there's a procedure set up in IRS regulations where they could have that be something that would not be subject to public disclosure. In fact, the information that they allege would cause harm if subject to public disclosure in the briefs, I think it's board minutes, the relationship they have with another organization, training materials, those three items are not even on the list of seven questions that TIGTA found to be unnecessary. So the predicate for their claim is not there. But 6104 is a law that requires any information submitted in the application to be subject to public disclosure, and the district court would not be able to get around that law. Any questions? Thank you. May it please the court. The Bivens analysis embodies a fundamental question. Who is best positioned to decide whether to create a damages cause of action against individual officers in a particular context? Congress or the courts? As Ms. Benitez pointed out, the Internal Revenue Code is such a special factor here. It's a comprehensive remedial scheme that provides an elaborate set of remedies for a range of IRS actions, including no fewer than six causes of action for civil damages. Now, true the vote invoked the Tenth Circuit's decision in Gibbs, and it distinguished the host of other circuit decisions refusing to extend Bivens to the tax code context by saying that they involved violations of the tax code. But the claims in all of those cases were premised on constitutional violations, and that's exactly what true the vote alleges here. Even in the Tenth Circuit's decision in Gibbs, the follow-on case to that, Archer refused to extend a First Amendment claim, just like we have here, to the context of tax assessment, tax determinations, like, say, a determination on tax-exempt status. But critically, the question isn't whether or not the constitutional violation or the alleged constitutional violation involves some violation of the comprehensive remedial scheme. Rather, it's whether or not Congress considered the harm when it enacted the remedial scheme, opted to provide a set of remedies for the administration of that scheme, and did not inadvertently exclude a damages remedy. And here, Congress, with knowledge of the allegations of this particular targeting scheme, considered amendments to the tax code. As Ms. Benitez explained, in December 2015 of this year, it amended the tax code, and it expanded the declaratory judgment action in 7428 to all 501c applicants. It did not create a damages remedy. It simply cannot be said... As of when? December 2015. It was the Protecting America from Tax Hikes Act of 2015. It was passed as part of the Consolidated Appropriations Act. It's public law number 114-113, and the PATH Act, the specific section on emergency... Give this to me again. What did they do to 7428 in December? Before this statute, the declaratory judgment relief in section 7428 was available only to applicants under 501c3. What this statute does is it makes that remedy available to all applicants for tax exemption under 501c. So, as it's most relevant... So as far as this case is concerned, it extends it to C4. Yeah, it extends it to C4 organizations as well. So what does that tell us except that before December, they didn't have a remedy? What it tells us is that Congress was aware of allegations that the tax code was being used this way. It considered the types of remedies that ought to apply in that circumstance, and it did not pass a damages action. You're also at the same time telling us this is a comprehensive remedial scheme, except it wasn't made comprehensive until after this case was filed. No, it was comprehensive before then, Your Honor. All that the December 2015 Act shows us is that Congress considered this particular targeting, and it did not see fit to include a damages remedy. Under those circumstances, it can't be said that Congress inadvertently omitted a damages remedy. In any event, twice back in the 1980s, Congress considered damages remedies that would have addressed the precise allegations here. One of them in 1987 would have created a damages action for constitutional violations by IRS officers. And in 1988, it would have created a damages action against the United States for violations related to tax collection or tax determination. The utility of legislative history is even further diminished when you talk about legislative non-history, things that were not passed in the distant past. I'm sure there were lots of other things that were not passed as well. What's important is that Congress considered this type of damages action, and it considered it with knowledge of allegations that the tax code could be used in this way. In December 2015, these precise allegations. In the 1980s, as Mr. Eastman pointed out, there were allegations going back to the 1970s. So Congress was aware that the tax code could be used in this manner, and it did not provide a damages action. And where Congress has made that decision, this court should defer. If I could just speak, I see I'm run over a little bit. If I could just speak to egregiousness very quickly. Judge Centelli, you noted that these were potentially egregious violations of the Constitution. Counsel, these were egregious violations of the Constitution if what's alleged is true. And it looks like they're a pretty good case from what we see so far. If they're true, they could be. Don't tell me they could be egregious violations. You can't stand that. You're not able to keep a straight face now. You can't stand there with a straight face and say this wouldn't constitute egregious violations. No one is arguing that what happened is how this should be done, Your Honor. Good. What's important is that, as this court pointed out, the existence of grievous wrongs does not free the judiciary to authorize any and all suits that might seem just. And that was Clavey-Panetta. If individual damages actions are to be the remedy for this type of alleged harm, that has to be a decision that Congress ought to make, not this court. Thank you, Mr. Mitz. I want to start with that our complaint failed to allege these things. I mean, it's throughout the complaint. It's both the application process and prospective problems that result from the targeting scheme itself. Paragraph 5, both current and prospective harm, First Amendment harms to our members, our officers, and our donors. Paragraph 6, the chilling effect, which is ongoing, as Judge Ginsburg pointed out. Paragraph 73, targeted applicants. And then, as we learned in the GAO report, anybody that was targeted as an applicant is now subject to ongoing heightened scrutiny. Page 21 of the GAO report talks about any referrals coming in from exempt organizations that have attracted media attention. I think we fit that category. Get subjected to a multilayer, high-profile committee review in addition to the normal reviews. That's ongoing. It's not limited to the application process. Second, I want to take up this 6103 issue. It's just patently false that we could have litigated the documents issue. If we had refused to provide the documents, we could not litigate that in a 7428 proceeding because the internal revenue regulations prohibit it. And their cover letter requesting those additional arguments says, if you do not respond, we will conclude that you have not taken all reasonable steps to complete your application. And under Code Section 7428B, that means you're not eligible to bring that action because it's not right. You've not taken all administrative steps. So, you know, just the utter false claim there. And then the third thing, that the IRS itself agrees with the Bivens claim. Here's what they said in Document 54 in the trial court. To the extent plaintiff seeks review to vindicate any alleged violations of its constitutional rights, plaintiff has available and, again, has raised claims under Bivens. Count three of the amended complaint. That's in the record. You know, so I don't know what you do with that. What was the document number? Document 54. It was filed on September 20th, 2013 in the trial court below. It's their motion to dismiss. And then let me address the speculative nature of the ongoing harm. They gave us our determination letter, they claimed, in September of 2013. We learned eight months later from a prospective donor that we were still not on the publicly available list of approved charities. You know, so it's not speculative. That happened and it continued on for at least eight months after they claimed they took action that mooted this case. And then finally, the notion that we can take judicial review of the defendant's own positions, that they stopped misbehaving, despite all the other evidence we have to the contrary, is not any notion of judicial review that I've ever dealt with before. You mean judicial notice? Judicial notice. I'm sorry. I'm sorry. Yeah. The notion that it's just because they posted it on their website, it now becomes a subject of judicial notice on hotly contested issues of fact, on a motion to dismiss where you're supposed to give our view of the facts every reasonable inference and presumption. You know, on all those grounds, I think this has to be sent back to the district court and, you know, at least an injunction to expunge the unlawfully collected information from our publicly available record. Further questions? Thank you, Mr. Eason. Thank you. Thank you all. Case is submitted.
judges: Henderson, Ginsburg, Sentelle